IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

KANSAS APPLESEED CENTER FOR LAW )
AND JUSTICE, INC., LOUD LIGHT,           )
DISABILITY RIGHTS CENTER OF KANSAS, )
DOROTHY NARY, MARTHA HODGESMITH,)
ROBERT MIKESIC, and BENJAMIN SIMONS,)
                                                               )
          Plaintiffs,                        )          Case No.: 2:25-cv-02375
                                                               )
v.                                                             )
                                                               )
SCOTT SCHWAB, in his official capacity as the )
Kansas Secretary of State; and JAMIE SHEW, )
in his official capacity as DOUGLAS COUNTY )
CLERK,                                                   )
          Defendants.                      )

## ANSWER TO FIRST AMENDED PETITION

Defendant Jamie Shew, in his official capacity as Douglas County Clerk ("Defendant"), by and through his undersigned counsel, responds as follows to Plaintiffs' First Amended Petition (Doc. 1-2) ("Petition"):

1.     Kansas has a uniquely long history of permitting its citizens to vote by mail, having provided for voting by mail ever since the Civil War. Today, every Kansas citizen is entitled by law to vote an advance ballot by mail-a system Kansas has had for nearly three decades. In recent elections, hundreds of thousands of Kansans have voted using an advance ballot returned to election officials by mail. These rights, however, are meaningless if Kansas's election system is not designed to reliably count the ballots of those who vote by mail, or if Kansas arbitrarily rejects ballots of lawful voters based on where they live or for circumstances outside of their control.

**ANSWER:**    **Defendant admits that Kansas have been permitted to vote by mail. Defendant admits that, in the past, some Kansans have voted using an advanced ballot returned by mail. Defendant is without knowledge or information sufficient to form a belief**

**as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 1 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

2.     Kansas's election officials have previously recognized this risk: In 2017, after recognizing that significant numbers of voters who timely mailed their ballots were being disenfranchised for postal delays outside their control, the Legislature passed a law requiring election officials to count advance ballots postmarked by election day as long as they were received by "the last delivery of mail" on the third day following the election. K.S.A. 25-1132(b). Backed by the support of then-Secretary of State Kris Kobach, the law was adopted nearly unanimously- with the Senate voting to pass it 40-0 and the House 123-1.

**ANSWER:     Defendant admits that the Legislature passed a law requiring election officials to count advance ballots postmarked by election day as long as they were received by "the last delivery of mail" on the third day following the election.  Defendant admits that then-Secretary of State Kris Kobach supported the law.  Defendant admits that the law was adopted nearly unanimously with the Senate voting to pass it 40-0 and the House 123-1. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 2 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

3.     The law, which became universally referred to as Kansas's "grace period" for receiving timely mailed ballots, proved to be critical to protect Kansans' rights. In the 2020 general election, the Secretary of State's Office reported that *over 32,000 ballots* arrived at county election offices during the three days after election day and were counted as a result. Without the grace

period, those ballots would have been thrown out, and those voters would have been disenfranchised.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 3 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

4.    Since 2017, postal delays have only worsened. In the last year, Defendant Secretary of State Scott Schwab has repeatedly noted how postal delays were disenfranchising voters--even with the grace period in place. In a September 2024 letter to the U.S. Postal Service, Secretary Schwab reported that Kansas voters' mail ballots were "failing to reach the county election office on time, even when voters have mailed them timely."

**ANSWER:    Defendant admits that, to the best of his knowledge, since 2017, postal delays have worsened in the area with which Defendant is familiar. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 4 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

5.    Although the grace period has been crucial for rural voters, it has also protected against the disenfranchisement of voters in diverse communities across the state as postal delays have increased. Nowhere in Kansas have these problems been on more prominent display than in Douglas County, Kansas, where Defendant Douglas County Clerk Jamie Shew has publicly lamented the state of postal delays in his county, which rejected over 200 ballots in the August 6, 2024 primary for arriving after the grace period, even though they had been *postmarked in July.*

**ANSWER:    Defendant admits that he has "publicly lamented the state of postal delays in his county, which rejected over 200 ballots in the August 6, 2024 primary for arriving after the grace period, even though they had been *postmarked in July*." Defendant admits that, to the best of his knowledge, postal delays have increased in Douglas County. Defendant denies every other statement, allegation, and averment set forth in Paragraph 5 of Plaintiffs' Petition.**

6.      The Kansas Legislature inexplicably responded to this crisis not by moving to protect voters against disenfranchisement but by *repealing* the grace period entirely with the passage of Senate Bill 4. After that law goes into effect on January 1, 2026, election officials will be required to reject ballots cast by lawful, eligible voters that are voted and postmarked by election day, unless the post office delivers them by 7 p.m. on election day (the "rejection rule").

**ANSWER:    Defendant admits that, "After that law goes into effect on January 1, 2026, election officials will be required to reject ballots cast by lawful, eligible voters that are voted and postmarked by election day, unless the post office delivers them by 7 p.m. on election day." The remaining allegations in Paragraph 6 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 6 of Plaintiffs' Petition.**

7.      SB 4 was broadly opposed not only by members of the public, many of whom testified against it, but also by the Elections Committee of the Kansas County Clerks and Election Officials Association (KCCEOA), which represents "all county clerks and election commissioners in Kansas." As the county election officials explained, the grace period had worked well, and SB

4 will only disenfranchise lawful, qualified voters. These same concerns led Governor Laura Kelly to veto SB 4, recognizing it as an "attack on rural Kansans who want to participate in the electoral process guaranteed by our Constitution" that would "disenfranchise thousands of Kansas voters." Nevertheless, the Legislature overrode the Governor's veto, making SB 4 law and eliminating the grace period.

**ANSWER:    Defendant admits that some members of the public opposed SB 4. Defendant admits Plaintiffs' allegations regarding the Elections Committee of the KCCEOA and that committee's stated position. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 7 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

8.    SB 4's threat of disenfranchisement is particularly acute for some of Kansas's most vulnerable populations. The elderly and Kansans with disabilities often have little to no choice but to vote by mail. And rural voters and voters who are temporarily out-of-state, such as many college students, will also be disproportionately affected because their mail is less likely to be delivered in a timely manner-a reality that the Kansas Secretary of State's Office itself recognized in analyzing the likely effects of SB 4.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 8 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

9.    To make matters worse, unlike in most other states where mail ballots are sent to

voters at least 30 or 45 days in advance of election day, Kansas *does not permit* election officials to mail advance ballots to voters until 20 days before election day. At the same time, the Secretary of State's Office has previously recommended that at least fourteen days be allowed for a ballot to travel to the voter and then back to the county election office, lest it arrive too late to be counted-and that was while the grace period was still in effect. Under SB 4, this tightly compressed window for mail voting is among the most restrictive in the country.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 9 of Plaintiffs' Petition that, "[u]nder SB 4, this tightly compressed window for mail voting is among the most restrictive in the country," and Defendant therefore denies that allegation.  For the same reason, Defendant denies Plaintiffs' characterization "[t]o make matters worse," which appears at the beginning of Paragraph 9.  Defendant is without knowledge or information sufficient to form a belief concerning what happens in "most other states," and therefore denies these allegations.  Defendant admits the remaining allegations set forth in Paragraph 9 of Plaintiffs' Petition.**

10.    With the enactment of SB 4, successfully voting by mail will become virtually impossible for many voters, including many who request an advance ballot near the end of the statutory period to do so-which runs up until one week before election day. As the Kansas Secretary of State's Office recognized in its 2024 Election Standards Guide, even before SB 4 eliminated the grace period, "in many situations" those later requests do not practically permit "sufficient time for the ballot to be mailed, voted and returned" to be counted. SB 4 ensures that this will be the fate of potentially thousands more lawful, eligible voters.

**ANSWER:    Defendant admits that the 2024 Election Standards Guide includes the statement attributed to it above.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 10 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

11.    Even for those voters who request their ballots well in advance, if delays outside their control arise at any stage of the process-and mail delays are only becoming more frequent-their ballot will be rejected, regardless of when it was sent. Indeed, under SB 4, whether any particular Kansan's vote counts will now likely depend on their geographic location and the arbitrary speed with which USPS delivers their ballot.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 11 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

12.    The Kansas Constitution does not permit voters to be treated with such caprice. Its equal protection clause prohibits the operation of a voting system that arbitrarily rejects voters' ballots based on their geography and whether the post office did its job effectively. Its due process clause requires that Kansas establish adequate procedures to ensure that voters have a reliable, fair, and effective method to cast their ballots. And, Article 5 does not permit such unjustified infringements on the constitutionally guaranteed right to vote.

**ANSWER:    The allegations in Paragraph 12 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required,**

**Defendant denies every statement, allegation, and averment set forth in Paragraph 12 of Plaintiffs' Petition.**

13.    Organizational Plaintiffs Kansas Appleseed Center for Law and Justice, Loud Light, and Disability Rights Center of Kansas each serve voter populations that are more likely to be harmed because of SB 4, and Individual Plaintiffs Dorothy Nary, Martha Hodgesmith, Robert Mikesic, and Benjamin Simons are all voters within those populations.  They bring this action to protect against harm to themselves as a result of SB 4 and, in the case of the Organizational Plaintiffs, harm to their constituents, as well.  They seek relief from this Court declaring SB 4 unconstitutional, enjoining its use, and ordering election officials to count all ballots that are postmarked by election day and received within seven days after the election-the time Kansas's own election officials expect it will take a ballot to reach its office.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 13 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments. In addition, some of the allegations in Paragraph 13 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required with respect to such allegations, Defendant denies them.**

14.    This is an action for declaratory and injunctive relief authorized by K.S.A. 60-1701, 60-1703 (declaratory relief) and K.S.A. 60-901, 60-902 (injunctive relief). This Court has jurisdiction pursuant to K.S.A. 20-301.

**ANSWER:    The allegations in Paragraph 14 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 14 of**

Plaintiffs' Petition.

15.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities. Defendant Jamie Shew, the County Clerk and Election Officer of Douglas County, resides in Douglas County. Defendant Schwab, the Secretary of State, has sufficient personal and business contacts with Douglas County, one of the state's most populous counties, for this Court to have personal jurisdiction over him in his official capacity.

**ANSWER:    The allegations in Paragraph 15 of Plaintiffs' Petition are legal conclusions to which no response is required.    Defendant admits that he is the Douglas County Clerk and Election Officer, and that he resides in Douglas County.    To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 15 of Plaintiffs' Petition.**

16.     Venue is proper before this Court under K.S.A. 60-602(2) because this action seeks an injunction regarding "act[s] done or threatened to be done" by Defendants in this district. Venue is further proper because Plaintiff Kansas Appleseed Center for Law and Justice, Inc. is headquartered and has its principal place of business in Douglas County and suffers injury there as a result of SB 4, and because Plaintiffs Dorothy Nary, Martha Hodgesmith, and Robert Mikesic are Douglas County Residents and suffer injury there as a result of SB 4.

**ANSWER:    The allegations in Paragraph 16 of Plaintiffs' Petition are legal conclusions to which no response is required.    To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 16 of Plaintiffs' Petition.**

17.     Plaintiff Kansas Appleseed Center for Law and Justice, Inc. ("Kansas Appleseed")

is a statewide nonprofit, nonpartisan advocacy organization dedicated to the belief that Kansans, working together, can build a state full of thriving, inclusive, and just communities. Kansas Appleseed is headquartered in Douglas County, Kansas, where the majority of its staff work and where it maintains its principal place of business. To accomplish its mission, Kansas Appleseed works with community partners to understand the root causes of problems, supports strong grassroots coalitions, advocates for comprehensive solutions so all Kansans can reach their full potential, and educates and engages voters across the state.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 17 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

18.    In particular, Kansas Appleseed's voter engagement work focuses on education and turnout in areas throughout Kansas where underrepresented populations, including voters experiencing food insecurity, voters in rural communities, and voters who are members of minority populations, are not afforded the same access to the ballot as others in Kansas. Kansas Appleseed seeks to increase voter engagement by organizing these communities and educating voters about candidates, issues on the ballot, and ways to vote through direct mailers, posting and amplifying social media content, text banking, as well as hosting in-person and virtual community relationship-building events. Kansas Appleseed also encourages voters to sign up for advance voting as a means of helping to increase turnout among underrepresented and underserved populations. With the grace period in place, Kansas Appleseed was able to help increase turnout among its target audience by 12 percent in the 2020 election as compared to the 2016 election.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 18 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

19.    SB 4 threatens Kansas Appleseed's mission by making it more difficult for the voters it serves to have their ballots counted. As a result, SB 4 not only threatens harm to Kansas Appleseed's constituents, it will require Kansas Appleseed to divert organizational resources to avoid the law's disenfranchising effects at the expense of other mission-critical priorities. Specifically, Kansas Appleseed will be forced to dedicate resources to educating voters about SB 4's rejection rule and to encouraging voters to return their advance ballots as soon as possible-in many cases, immediately upon receiving it-to avoid being disenfranchised, including dedicating additional resources towards its voter turnout programming, the success of which SB 4 directly threatens. Those resources would otherwise be directed towards voter registration and other critical voter engagement work.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 19 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

20.    Plaintiff Loud Light is a nonpartisan nonprofit organization whose mission is to engage, educate, and empower individuals from underrepresented populations, in particular, young voters, to become active in the political process. Loud Light achieves these goals by directly engaging current and prospective voters both virtually and in person, conducting presentations in

classrooms on college campuses, and sending educational mailers. Loud Light proceeds from the fundamental belief that less voter turnout means fewer needs are met within the community. As a result, Loud Light's core work focuses on strategies to increase turnout among Kansas's young voters, who have traditionally suffered lower turnout rates. To achieve this goal, Loud Light runs young voter registration drives, creates multi-media content about how to participate in elections, builds coalitions within the community to advocate for positive policy changes for youth, and works tirelessly to encourage voters to sign up for advance voting and to educate them on the process. Each of these efforts are aimed at ensuring that voters are able to cast their ballot and to have it counted.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 20 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

21.   SB 4 threatens Loud Light's mission by making it more difficult for the voters it serves to have their ballots counted. As a result, SB 4 not only threatens harm to Loud Light's constituents, it will require Loud Light to divert organizational resources to avoid the law's disenfranchising effects at the expense of other mission-critical priorities. Specifically, Loud Light will be forced to divert resources to educating voters about SB 4's rejection rule and to encouraging them to return their advance ballots as soon as possible-in many cases, immediately upon receiving it-to avoid being disenfranchised. Those resources would otherwise be directed towards other mission-critical priorities, including towards training and supporting Loud Light's student fellowship program.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 21 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

22.    Plaintiff Disability Rights Center of Kansas ("DRC"), is a private not-for-profit organization fighting for equality, law, and justice for people with disabilities. DRC provides free advocacy and legal services for Kansans with disabilities. Additionally, it works on public policy issues in Kansas, educating the public, policymakers, and the press on disability rights issues. Under federal law, as the only "Protection and Advocacy" (P&A) system for Kansas, DRC also has a mandate to "educate policymakers" on proposed policy changes and the impact on people with disabilities. DRC did educate state lawmakers about the harmful effects SB 4 on people with disabilities, but the Kansas Legislature passed it anyway. DRC recognizes that access to absentee ballots, permanent absentee ballots, and advance balloting options are critical to increasing voter turnout among individuals with disabilities. As a result, it promotes these forms of voting through its voter education programs and voter registration, which it offers at DRC events. Each election cycle, DRC has provided help to numerous Kansans with disabilities to ensure they can effectively cast their ballots.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 22 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

23.    SB 4 threatens DRC's mission by making it more difficult for the voters it serves

to have their ballots counted. In fact, the Protection and Advocacy for Voting Access law (PAVA - Section 291 of the Help America Vote Act) requires DRC as the P&A agency for Kansas to, among other things, "ensure full participation in the electoral process for individuals with disabilities, including registering to vote, casting a vote and accessing polling places." SB 4 will make it much more difficult for Kansans with disabilities to do those things and more difficult for DRC to do what is required of it under federal law, as people with disabilities are proportionately more likely to vote by advance ballot—indeed, only Kansans with disabilities can be approved to obtain a permanent advance ballot. SB 4 not only threatens harm to the very voters that DRC is mandated by federal law to serve, as a direct result of the changes mandated by SB 4 and its negative impact on Kansans with disabilities, DRC will be required to divert organizational resources to avoid the law's disenfranchising effects at the expense of other mission-critical priorities.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 23 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

24.    Specifically, DRC will be forced to dedicate resources to educating voters about SB 4's rejection rule and to encouraging voters to return their advance ballots as soon as possible-in many cases, immediately upon receiving it-to avoid being disenfranchised. Even worse, because in many rural and frontier parts of Kansas, postal mail is so painfully slow, DRC will be forced to proactively advise voters in those areas to potentially avoid mail voting entirely. But if that mode of voting is not realistically available or trustworthy, the choice for some will be between not

voting at all and casting a ballot by mail, even recognizing that it is unlikely to arrive in time to be counted. This is because voting in person can be quite difficult for many people with disabilities, as there can be numerous barriers for Kansans with disabilities to cast an in-person ballot at a polling place. And even those who can overcome the hurdles to do so will be forced to undertake burdens that they should not have to under their constitutional guarantees and legal rights afforded by Kansas law.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 24 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

25.    DRC has finite resources. The resources that it will be forced to redirect to respond to SB 4 will directly impede its other mission-critical activities. In particular, it will translate into fewer Kansans with disabilities receiving DRC's legal services to respond to significant civil and disability rights violations, such as abuse, neglect or exploitation, to overturn the denial of necessary health and long-term care services to keep people with disabilities alive, and to enforce the disability rights of Kansans under state and federal law (for example: the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Individuals with Disabilities Education Act, the Fair Housing Amendments Act, the Social Security Act, Medicaid, etc.). Having to address the burdens imposed by SB 4 on voters with disabilities in particular, will also mean that DRC can serve fewer disabled Kansans overall, denying some assistance entirely.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 25**

of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.

26.     Plaintiff Dorothy "Dot" Nary is a resident of Douglas County, Kansas, where she is registered to vote. Plaintiff Nary is 69 years old and has lived in Douglas County since 1997. She first registered to vote in Kansas in 1996 and has voted consistently since then. Plaintiff Nary has experienced serious delays sending mail in Douglas County. Just earlier this year, for example, it took up to 11 days for her Valentine's Day cards to be delivered to nearby friends in Kansas. Advance Ballots are critical for Plaintiff Nary, who uses a wheelchair and has mobility issues which prevent her from voting in person. SB 4's rejection rule substantially burdens her ability to vote and risks disenfranchising her altogether.

**ANSWER:**    **Defendant admits that Plaintiff Nary is registered to vote in Douglas County, Kansas. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 26 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

27.     Plaintiff Martha Hodgesmith is a resident of Douglas County, Kansas, where she is registered to vote. She is 73 years old and has lived in Douglas County since 2011. She first registered to vote in Kansas in 1972 and has voted consistently since then. Advance ballots are critical for Plaintiff Hodgesmith, who has worsening mobility issues that make it increasingly difficult to vote in person. Complications from post-polio syndrome prevent her from standing in line for any length of time, and she uses a walking stick. SB 4's rejection rule substantially burdens her ability to vote and risks disenfranchising her altogether.

**ANSWER:** Defendant admits Plaintiff Hodgesmith is registered to vote in Douglas County, Kansas. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 27 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.

28.    Robert "Bob" Mikesic is a resident of Douglas County, Kansas, where he is registered to vote. He has lived in Douglas County since 1984 and has voted consistently since then. He has experienced mail delays with his medication not always arriving on time. Advance ballots are critical to Plaintiff Mikesic, who uses a wheelchair, is on Kansas's permanent absentee voting list, and cannot easily vote in person. SB 4's rejection rule substantially burdens his ability to vote and risks disenfranchising him altogether.

**ANSWER:** Defendant admits Plaintiff Mikesic is registered to vote in Douglas County, Kansas. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 28 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.

29.    Plaintiff Benjamin Simons is a permanent resident of Lyon County, Kansas, where he is registered to vote, although he currently lives in Stillwater, Oklahoma, where is enrolled at Oklahoma State University. He is 21 years old and has either voted or attempted to vote in every election since he turned 18. In 2022, he requested an advance ballot by mail to be sent to his address in Oklahoma, but the ballot did not arrive in time, so he was unable to vote. For the 2024 election, Plaintiff Simons and his family took extreme measures to ensure he would be able to

vote. Specifically, in 2024, he requested his advance ballot be sent to his home address in Kansas; his mother then drove the ballot to and from Oklahoma to ensure his ballot would be counted. Advance ballots are critical for Plaintiff Simons as an out-of-state college student. SB 4's rejection rule substantially burdens his ability to vote and risks disenfranchising him altogether.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 29 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

30.    Defendant Scott Schwab is the Secretary of State of Kansas. The Secretary of State is Kansas's chief election official and is responsible for carrying out the state's election laws. K.S.A. 25-2504. He has a mandatory duty to train and provide instruction "for complying with federal and state laws and regulations" to county election officers. K.S.A. 25-124. He is also charged with "adopt[ing] rules and regulations to implement" SB 4's rejection rule. K.S.A. 25-1132.

**ANSWER:    Defendant admits that Scott Schwab is the Secretary of State of Kansas and that Plaintiffs have accurately quoted the referenced statutes. The remaining allegations in Paragraph 30 of Plaintiffs' Petition are legal conclusions to which no response is required. To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 30 of Plaintiffs' Petition.**

31.    Defendant Jamie Shew is the County Clerk and Election Officer for Douglas County and is sued in his official capacity. Defendant Shew is responsible for managing and conducting all elections in Douglas County. Shew will administer the primary and general

elections in Douglas County in 2026.

    **ANSWER:**    **Defendant admits the allegations set forth in Paragraph 31 of Plaintiffs' Petition.**

    32.    Kansas law has provided for voting by mail in some form since the Civil War. Even the Kansas Constitution recognizes the importance of voting by mail; Article 5, Section 1 expressly recognizes the right to vote "either in person or by absentee ballot" in presidential elections.

    **ANSWER:**    **Defendant admits the allegations set forth in Paragraph 32 of Plaintiffs' Petition.**

    33.    For three decades, Kansas has permitted any voter to vote an advance ballot by mail in any election. Voters do not need an excuse to vote by mail; it is simply their right under Kansas law. KS.A. 25-1119(a).

    **ANSWER:**    **Defendant admits the allegations set forth in Paragraph 33 of Plaintiffs' Petition.**

    34.    Kansas's unique geography makes voting by mail particularly important. Approximately 28% of Kansans live in rural areas, where easy access to an election office or a drop box may not be a practical reality.

    **ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 34 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

    35.    Voting by mail is also particularly important to the elderly and to the thousands of Kansans with disabilities, including Plaintiffs Nary, Hogesmith,[sic] and Mikesic. Kansas law recognizes this: Any voter who has a permanent disability or illness is eligible to receive permanent

advance voting status, which means the voter is automatically mailed a ballot every election, without having to submit an application to do so.  K.S.A. 25-1122(h).

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in the first sentence of Paragraph 35 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments. The remaining allegations in Paragraph 35 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every such statement, allegation, and averment.**

36.    In the 2024 general election, Kansans cast over 137,000 ballots by mail-ten percent of all votes. In the 2022 general election, 13.1 percent of Kansans--over 131,000 people-voted by mail. The figure was even higher for the 2020 general election, conducted at the height of the COVID-19 pandemic. That year, over 460,000 Kansans chose to vote by mail-over a third of the entire electorate.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 36 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

37.    Until 2017, Kansas law required advance mail ballots to be received by election day to count. But worsening postal delays meant that increasing numbers of Kansans' ballots were being received after election day and rejected as a result.

**ANSWER:    Defendant admits the allegations contained in the first sentence of Paragraph 37 of Plaintiffs' Petition. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and**

averments set forth in Paragraph 33 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.

38.     For instance, in Kansas's 2016 general election-before the grace period was enacted-the Secretary's Office reported that 1,500 ballots were rejected for arriving after election day.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 38 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

39.     Election officials attributed the alarming number of ballot rejections to known USPS delays.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 39 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

40.     For instance, in 2017, Defendant Douglas County Clerk and County Election Officer Jamie Shew reported that USPS had "reduced the number of mail processing centers, limited weekend processing and routed mail to larger regional centers." This included closing seven mail processing centers in Kansas.

**ANSWER:     Defendant admits the allegations set forth in Paragraph 40 of Plaintiffs' Petition.**

41.     As a result, Defendant Shew reported that some Kansas mail had to go out-of-state for processing in Texas, Nebraska, or Missouri. Shew also said that with limited weekend

processing, mail sent on Friday or Saturday may not begin to be processed until the following

Monday, jeopardizing a Tuesday (election day) delivery.

**ANSWER:    Defendant admits the allegations set forth in Paragraph 41 of Plaintiffs'**

**Petition.**

42.    Defendant Shew described the practical impact of these changes on voting by mail:

"[A]s these changes have occurred, county election offices have experienced an increase in ballots

not arriving until the Wednesday or Thursday after Election Day." Shew said these ballots were

not counted under Kansas law at the time even if it was "clear the ballot was sent days before the

election."

**ANSWER:    Defendant admits the allegations set forth in Paragraph 42 of Plaintiffs'**

**Petition.**

43.    Faced with a system that rejected voters' ballots through no fault of their own, the

Legislature knew it needed to make a change. It ultimately enacted legislation (HB 2158 in 2017)

that provided that ballots postmarked by election day would be counted if they arrived within three

days of the election. The law became known as Kansas's "grace period" for timely mailed ballots.

**ANSWER:    Defendant admits that the referenced legislation was enacted.    The**

**remaining allegations in Paragraph 43 of Plaintiffs' Petition are legal conclusions to which**

**no response is required.    To the extent any response may be required, Defendant denies every**

**statement, allegation, and averment set forth in Paragraph 43 of Plaintiffs' Petition.**

44.    At the time of its proposal and adoption, the grace period garnered widespread

support. Then-Secretary of State Kris Kobach, for example, supported the grace period. As his

office acknowledged, recent closures of USPS locations in Kansas led to "an increase in the

amount of time needed to transmit mail," and in some cases, there was "not enough time for a

ballot to be transmitted to the voter and the voter return the ballot by mail prior to the deadline."

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 44 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

45.    The grace period won nearly unanimous support from the Legislature. The Kansas Senate voted in favor of the change 40-0, and the House voted in favor 123-1.

**ANSWER:    Defendant admits the allegations set forth in Paragraph 45 of Plaintiffs' Petition.**

46.    Under the grace period, Kansas law provided that ballots "which are postmarked or are otherwise indicated by the United States postal service to have been mailed on or before the close of the polls on the date of the election" shall be counted so long as they are received by "the third day following the date of the election." K.S.A. 25-1132(b). Specifically, to be counted, a mail-in ballot was required to be received by the county election officer by "the last delivery of mail" on the third day. *Id.*

**ANSWER:    Defendant admits the allegations set forth in Paragraph 46 of Plaintiffs' Petition.**

47.    This grace period proved crucial in protecting the right to vote by advance ballot in Kansas. In 2020, a year in which many Kansans voted by mail, the Secretary's Office reported that 32,367 advance ballots arrived at county election offices during the three-day grace period. But for the Legislature's adoption of the grace period, these voters would have been disenfranchised-enough Kansans to fill an entire city.

**ANSWER:    Defendant is without knowledge or information sufficient to form a**

**belief as to the truth of the statements, allegations, and averments set forth in Paragraph 47 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

48.    In the 2024 general election, which saw lower rates of advance mail voting as compared to 2020, 2,110 ballots still arrived in the three days after election day, each of which had been sent on or before election day. Without the grace period, however, those ballots would have been rejected, and the voters who cast those ballots would have been disenfranchised. Another 603 ballots were rejected entirely for arriving after three days beyond the election.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 48 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

49.    The grace period is particularly important in Kansas because state law prohibits election officials from mailing ballots to voters until 20 days before the election, even if the voter has requested an advance ballot well before then or is on the permanent advance voter list. *See* K.S.A. 25-1123(a).

**ANSWER:    Defendant admits that state law prohibits election officials from mailing ballots to voters until 20 days before the election. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining allegation set forth in Paragraph 45 of Plaintiffs' Petition that "[t]he grace period is particularly important in Kansas" and Defendant therefore denies that allegation. The remaining statements, allegations, and averments in Paragraph 49 of Plaintiffs' Petition are legal conclusions to which no response is required. To the extent any response may be required, Defendant**

denies every such statement, allegation, and averment.

50.    This is one of the shortest turn-around periods for mail voting in the country. Most states send out ballots 30 to 45 days before the election, and some send out ballots as far as 60 days before the election.

**ANSWER:    Defendant admits the allegations contained in the second sentence of Paragraph 50 of Plaintiffs' Petition.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 50 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

51.    With the elimination of the grace period, Kansas is an outlier---only one other state (Iowa) with an election-day ballot receipt deadline waits as long as Kansas does to send ballots to voters. *See* Iowa Code 53.8(1)(a). With the elimination of the three-day grace period, Kansas's 20-day turn-around time for voting by mail is tied with Iowa as the shortest in the nation.[1]

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 51 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

52.    Even when the grace period was still in effect, the turn-around time in Kansas was still difficult to meet. Both Defendant Secretary Schwab and Defendant Douglas County Clerk

---

[1] Oregon and Washington wait to mail out ballots until 20 and 18 days before an election, respectively-but they also have laws requiring election officials to accept ballots that are voted by election day but received within a period afterward. Oregon counts all ballots received within seven days of the election if postmarked on or before election day, *see§* Or. Rev. Stat. 253.070, and Washington counts all ballots received no later than the day before certification (at least fourteen days after the election) if postmarked on or before election day, *see* Was. Rev. Code § 29A.40.091, 29A.60.190.

Shew have previously said that voters should assume it takes *seven days* for a ballot to travel each way-that is, "seven days to get there and seven to get back."

**ANSWER:** **Defendant admits the allegations contained in the last sentence of Paragraph 52 of Plaintiffs' Petition. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 52 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

53.    In practice, this means that a Kansas voter who requests an advance mail ballot towards the end of the time period to do so-currently one week before Election Day-has little realistic chance of receiving and sending back their ballot in time to be counted.

**ANSWER:** **Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 53 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

54.    In Kansas's 2024 Elections Standards Guide, the state recognized, "in many situations," those later requests do not practically permit "sufficient time for the ballot to be mailed, voted and returned" to be counted, *even with* the state's then-existing grace period, which SB 4 has eliminated.

**ANSWER:** **Defendant admits that the referenced publication is correctly quoted. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 54 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

55.    In recent years, USPS's performance in Kansas has continued to deteriorate. Some

of that decline is related to national USPS trends. In the past few years, for example, USPS changed its first-class mail standards, the method by which advance ballots are sent. Instead of delivering first-class mail within three days, USPS now seeks to deliver first-class mail within five days.

**ANSWER:   Defendant admits the allegations set forth in Paragraph 55 of Plaintiffs' Petition with respect to the geographic area within Kansas with which Defendant is familiar.**

56.     But some of the postal delays are specific to Kansas. Much of Kansas's mail (even intra-state mail) must leave the state for processing before it can be delivered. This is true of ballots, too. As Secretary of State Schwab recognized in 2024, "almost all of the ballots in Kansas leave the state" when they are put in the mail.

**ANSWER:   Defendant admits the allegations contained in the first three sentences of Paragraph 56 of Plaintiffs' Petition. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 56 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

57.     In September 2022, U.S. Senator Josh Hawley of Missouri demanded an audit of the Kansas-Missouri USPS district after residents reported "routinely waiting more than five days to receive mail."

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 57 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

58.     That audit surveyed several USPS locations in the Kansas-Missouri district,

including in particular the Kansas City, Missouri Processing and Distribution Center (which processes mail from both Kansas and Missouri). Completed in 2023, the audit confirmed significant mail processing delays at the regional Kansas City Processing and Distribution Center.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 58 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

59.    By 2024, however, little had been done to improve the situation. In 2024, USPS conducted another audit in the Kansas-Missouri district, this time surveying the Kansas City Processing and Distribution Center, as well as individual USPS stations in Kansas. The audit again found significant mail delays, ranking the Kansas-Missouri USPS district the third worst-performing mail district in the nation (out of fifty districts).

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 59 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

60.    In September 2024, a bipartisan group of U.S. Representatives from Kansas and Missouri, including Kansas U.S. Representative Sharice Davids, wrote to USPS Postmaster General DeJoy relaying concerns from constituents about "missing mail, delayed postal delivery, and extended periods with no delivery service at all."

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 60**

of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.

61.     Official data from USPS confirms that mail service in the Kansas-Missouri USPS district has indeed deteriorated significantly in the past few years. For instance, in the first quarter of 2023, USPS delivered 90 percent of first-class, two-day service standard mail in the district on time. By the first quarter of 2025, that figure had declined to 83 percent.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 61 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

62.     And the situation is much worse for first-class mail that USPS anticipates will take three to five days in the first instance. In the first quarter of 2023, USPS delivered 78 percent of first-class, three-to-five-day service standard mail in the district on time. *By the first quarter of 2025, that figure had declined to just 61 percent.*

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 62 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

63.     This growing crisis has sparked a public outcry, including from the Kansas Secretary of State. In the lead-up to the 2024 general election, Secretary Schwab wrote to USPS Postmaster General DeJoy that he was "extremely concerned there is a troubling pattern that persists in [USPS's] processing and handling of ballots." Secretary Schwab noted that many ballots

were "failing to reach the county election office on time, even when voters have mailed them timely."

**ANSWER:   Defendant admits he is aware that Secretary Schwab wrote a letter to USPS Postmaster General DeJoy prior to the 2024 general election.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 63 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

64.    Secretary Schwab's letter continued: "Multiple county election officials have notified my office that ballots were received from the local post office days, if not weeks, after they were placed in the custody of the USPS," acknowledging that the situation was resulting in the disenfranchisement of qualified Kansas voters. And this was *before* the elimination of the grace period.

**ANSWER:   Defendant admits he is aware that Secretary Schwab wrote a letter to USPS Postmaster General DeJoy prior to the 2024 general election.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 64 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

65.    As Secretary Schwab concluded in his letter to Postmaster Deloy, "Kansas has had mail voting in some form since the Civil War, but never has a lack of confidence in the delivery of our ballot been questioned as it has in the 21st Century."

**ANSWER:   Defendant admits he is aware that Secretary Schwab wrote a letter to USPS Postmaster General DeJoy prior to the 2024 general election.  Defendant is without**

knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 65 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.

66.     Secretary Schwab also raised alarm on social media, writing, "The Pony Express is more efficient at this point" in an August 27, 2024, post on X.com, as shown below:



**ANSWER:**     **Defendant admits the allegations set forth in Paragraph 66 of Plaintiffs' Petition.**

67.     In fact, Secretary Schwab began to discourage Kansans from voting by mail altogether—even though Kansas law has long permitted every Kansas voter to do just that. In an August 23, 2024, post on X.com shown below, Secretary Schwab wrote, "Do not use USPS to deliver your ballot. Keep your ballot out of the hands of the federal government!"



**Secretary Scott Schwab**
@ScottSchwabKS

Do not use USPS to deliver your ballot.

Keep your ballot out of the hands of the federal government!

 **CBS News** @CBSNews · Aug. 23. 2024
USPS said it needs to shave more costs from its operations to get into better
financial shape. To do that, the postal agency wants to overhaul its delivery
logistics, resulting in some customers likely seeing a slowdown in their mail
delivery.
...

11:43 AM · Aug. 23. 2024 · **1,358** Views

**ANSWER:** **Defendant admits the allegations set forth in Paragraph 67 of Plaintiffs'**

**Petition.**

68.    Then again, in an October 10, 2024, post, Secretary Schwab wrote, "mailing your

ballot still has the highest risk of it not being counted compared to other voting methods."

**ANSWER:** **Defendant admits the allegations set forth in Paragraph 68 of Plaintiffs'**

**Petition.**

69.    Others[sic] election officials echoed Secretary Schwab's concerns. During the

National Association of State Election Directors' July 2024 conference, Kansas Elections Director

Bryan Caskey told a USPS manager, "Actual elections are being determined by these delays, and

I just want to make sure that you're hearing why we're so upset."

**ANSWER:** **Defendant is without knowledge or information sufficient to form a**

**belief as to the truth of the statements, allegations, and averments set forth in Paragraph 69**

**of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and**

averments.

70.    Just one month later, in the August 6, 2024 primary, Douglas County rejected more than 200 ballots that arrived more than three days after the election, *even though the ballots had been postmarked in July.*

**ANSWER:    Defendant admits the allegations set forth in Paragraph 70 of Plaintiffs' Petition.**

71.    One Douglas County voter, Jamie Miller, told the Lawrence Times that her ballot was rejected because it arrived late, despite mailing her ballot *weeks* before election day.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 71 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

72.    Recently, Defendant Douglas County Clerk Jamie Shew said his office finds it takes an average of seven to nine days to deliver mail ballots to Lawrence voters. Shew remarked, "We often joke we could walk to people's houses faster than it gets there by mail."

**ANSWER:    Defendant admits the allegations set forth in Paragraph 72 of Plaintiffs' Petition.**

73.    Of course, if it regularly takes up to nine days to deliver mail in Douglas County, voters in Douglas County have effectively no time to return their ballots by mail in time for them to be counted under SB 4, even when Douglas County sends them on the first possible day they are allowed to mail ballots under Kansas law.

**ANSWER:    Defendant is without knowledge or information sufficient to form a**

**belief as to the truth of the statements, allegations, and averments set forth in Paragraph 73 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

74.    The individual Douglas County Plaintiffs have also experienced troubling mail delays—including some beyond the seven to nine day average observed by County Clerk Shew. Earlier this year, for example, Plaintiff Nary's Valentine's Day cards took up to 11 days to be delivered to nearby friends and family in Kansas, and Plaintiff Mikesic has experienced delays in mail deliveries of his medication.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 74 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

75.    Instead of creating legislative solutions that would help fix the problem and ensure that mail delays do not result in the rejection of ballots cast by qualified, eligible Kansas voters, the Legislature voted to make the problem much worse.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 75 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

76.    In January 2025, Kansas State Senator Mike Thompson introduced SB 4, which proposed (and ultimately would) eliminate the three-day grace period and require election officials to reject all ballots received after 7:00 p.m. on the day of the election-even if the ballots were

postmarked on or before election day.

**ANSWER:** **Defendant admits the allegations set forth in Paragraph 76 of Plaintiffs' Petition.**

77.    Where proponents spoke in favor, they alluded to debunked conspiracy theories that elections would be stolen or flipped by ballots arriving after election day.

**ANSWER:** **Defendant admits the allegations set forth in Paragraph 77 of Plaintiffs' Petition.**

78.    Defendant Secretary Schwab's office publicly rejected this theory as completely false, writing that it was not the case that "[l]ate arriving mail ballots cause election results to flip after election night. The reality is that most of the votes added to the election count after the unofficial election night results are from ballots that arrived on or before election day."

**ANSWER:** **Defendant admits the allegations set forth in Paragraph 78 of Plaintiffs' Petition.**

79.    Other proponents of SB 4 made facially illogical arguments in favor of the bill. Kansas Representative Pat Proctor, the House Elections Committee Chair who sponsored SB 4, initially argued that rural voters were "disenfranchise[ed]" by the grace period because their ballots arrived without postmarks. He argued this justified eliminating the grace period entirely.

**ANSWER:** **Defendant admits the referenced statement was made and that Representative Proctor argued as referenced. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 79 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

80.    Of course, this argument is non-sensical-eliminating the grace period would only exacerbate the problem by disenfranchising even more Kansans, particularly rural voters, whose ballots disproportionately arrive after election day.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 80 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

81.    At the same time, however, Representative Proctor acknowledged his real goal in passing SB 4 and bills like it: To "chip away" at advance voting. As Representative Proctor admitted in a leaked video, "If it was up to me, Election Day would be Election Day." "There wouldn't be early voting. Mail-in ballots would only be for military or severely disabled."

**ANSWER:**    **Defendant admits he is aware of the allegedly leaked video and, upon information and belief, that it includes the quoted statements. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 81 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

82.    Most of the testimony in response to SB 4 demonstrated strong opposition to eliminating the grace period. Moreover, hearings and testimony on SB 4 provided overwhelming evidence that postal delays had only worsened since 2017, and that removing the three-day grace period would accordingly disenfranchise many Kansans who exercise their right to vote by mail.

**ANSWER:**    **Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 82**

of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.

83.    Although Secretary Schwab's Office did not take an official position in favor or against SB 4, the Secretary's Office provided testimony that was highly critical of SB 4. As the Secretary's Office testified, (1) USPS "delivery has gotten ever slower since 2017," when Kansas first adopted the grace period, (2) Kansas's "comparatively short time period in which ballots are mailed out and returned" makes returning ballots by election day comparatively more difficult for Kansas voters than in other states, and (3) "Kansas voters temporarily living out of state who do not qualify for federal voting status (e.g., college students) may have increased difficulty in returning their advance by mail ballot by Election Day without the use of overnight delivery."

**ANSWER:    Defendant admits the referenced testimony was offered.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 83 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

84.    The Kansas County Clerks and Election Officers who actually administer elections in Kansas were also opposed to SB 4. Specifically, the Elections Committee of the Kansas County Clerks and Election Officials Association (KCCEOA), which represents all county clerks and election commissioners in Kansas, submitted written testimony that passing SB 4 would result in the disenfranchisement of valid votes.

**ANSWER:    Defendant admits that the Elections Committee of the KCCEOA submitted written testimony as referenced.  Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and**

averments set forth in Paragraph 84 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.

85.    KCCEOA testified, "We believe that the current deadline for receipt of valid advance ballots by mail should remain. With delivery delays by the US Postal Service expected to continue, we believe that allowing ballots mailed prior to the close of polls on Election Day to be received by the 3rd day following the election ensures that valid voted ballots are accepted and included in the final results." KCCEOA noted that although the number of ballots that would be discarded under an election day deadline might be relatively small in any particular county, it "adds up across 105 counties."

**ANSWER:    Defendant admits the allegations set forth in Paragraph 85 of Plaintiffs' Petition.**

86.    The Legislature also heard from numerous communities representing rural voters and voters with disabilities about how SB 4 would be disproportionately likely to disenfranchise them. Organizations that testified in opposition to the bill included nonprofit voter advocacy organizations, faith organizations, and disability rights organizations.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 86 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

87.    For example, Davis Hammet, President of Plaintiff Loud Light, testified that rural county voters will be hurt worst by SB 4. Hammet provided data to the Legislature, gathered from the Secretary of State's survey to county election officials, which showed that "voters in rural

counties benefitted the most from the 3-day mail processing period, with rural votes being twice as likely to be counted because of the 3-day grace period than non-rural votes." For example, the data showed that nearly 12% of the advance mail ballots in Montgomery County and over 10% of the mail advance ballots in Nemaha and Seward Counties arrived during the three days after the election. In other words, 10-12% of the voters who voted by mail would have been disenfranchised in those counties under SB 4.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 87 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

88.    Mike Burgess, Director of Policy and Outreach at Plaintiff DRC, also emphasized SB 4's potential impact on Kansans with disabilities, who heavily rely on advance voting by mail. And beyond their general reliance on those kinds of ballots, Burgess testified that for voters with disabilities, "it is not just a matter of running out to the mailbox to mail something or hopping in their car to quickly return their ballot to the election office." Kansans with disabilities sometimes require "assistance just to make it out of their front door" or have mobility challenges and require special transportation to be scheduled days in advance. Similarly, he testified that "Kansans with dexterity challenges ... may require assistance just to complete their ballot, put it into the return envelope, complete all of the required affidavits, and then ensure it gets mailed soon enough to make it back in time."

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 88**

of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.

89.     As Burgess concluded, "The three day 'grace period' has been very helpful for many Kansans with disabilities who face additional barriers to want to ensure their vote counts just like every other eligible Kansas voter. Many Kansans with disabilities utilize advance voting by mail. They would definitely be amongst the Kansans who could be negatively impacted by the change in this bill."

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 89 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

90.     Many individual Kansas voters also testified in opposition to SB 4, including about their personal experience with postal delays and their expectation that it would be harder for their advance ballot to be counted if SB 4 passed.

**ANSWER:     Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 90 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

91.     For example, Donna Patton, a senior citizen from Fairway, testified that her "home mail delivery is quite sporadic." She said she often goes "three days without a pick up or delivery." She testified that she has "mobility issues," which means "not being able to drive to the post office to post mail."

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 91 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

92.    As Rabbi Moti Rieber of Kansas Inter Faith Action testified, "All of us have had the experience of the mail taking days to arrive, which is a problem that seems to be getting worse - that's why this grace period exists, so that people who remember to vote by election day can have those votes counted.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 92 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

93.    In the end, despite overwhelming evidence that removing the three-day grace period would disenfranchise Kansans without serving any legitimate state interest, the Legislature passed SB 4, largely along party lines.

**ANSWER:    Defendant admits that the Legislature passed SB 4, largely along party lines. Defendant is without knowledge or information sufficient to form a belief as to the truth of the remaining statements, allegations, and averments set forth in Paragraph 93 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

94.    As one newspaper reported, those voting in favor of SB 4 included many Republican legislators who once supported the grace period but flipped their positions "after mail

voting was politicized following President Donald Trump's claims of fraud in the 2020 election." Those claims were repeatedly debunked in legal cases following that election and have never been substantiated.

**ANSWER:   Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 94 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

95.    On March 24, 2025, Governor Kelly vetoed SB 4. As she explained in her veto message, "The three-day grace period for mail ballots was a bipartisan solution approved by the Legislature in 2017 to address delays in processing of mail by the United States Postal Service, particularly in rural areas. The goal was to ensure that all Kansans had their votes counted, no matter where they lived." She concluded: "This bill is an attack on rural Kansans who want to participate in the electoral process guaranteed by our Constitution. I will not sign legislation that deprives Kansans from having their vote counted."

**ANSWER:   Defendant admits the allegations set forth in Paragraph 95 of Plaintiffs' Petition.**

96.    The next day, however, the Legislature overrode her veto, passing SB 4 into law on March 25, 2025.

**ANSWER:   Defendant admits the allegations set forth in Paragraph 96 of Plaintiffs' Petition.**

97.    SB 4 amends K.S.A. 25-1132(b) to state, "The deadline for the receipt by mail of the advance voting ballots by the office of the county election officer shall be 7:00 p.m. on the date

of the election." It takes effect on January 1, 2026.

**ANSWER:    Defendant admits the allegations set forth in Paragraph 97 of Plaintiffs'**

**Petition.**

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

*Violation of Equal Protection*
(Kan. Const. Bill of Rights §§ 1-2)

98.    Plaintiffs hereby re-allege and incorporate by reference all prior paragraphs of this

Complaint and the paragraphs below as though fully set forth herein.

**ANSWER:    Defendant denies every statement, allegation, and averment set forth in**

**Paragraph 98 of Plaintiffs' Petition.  Defendant further incorporates by reference all its**

**above-stated denials.**

99.    Section 1 of the Bill of Rights of the Kansas Constitution guarantees equal rights

to all Kansans, stating that "[a]ll men are possessed of equal and inalienable natural rights, among

which are life, liberty, and the pursuit of happiness."

**ANSWER:    Defendant admits the allegations set forth in Paragraph 99 of Plaintiffs'**

**Petition.**

100.    As the Kansas Supreme Court has held, "section 1 of the Kansas Constitution Bill

of Rights acknowledges rights that are distinct from and broader than the United States

Constitution and that our framers intended these rights to be judicially protected against

governmental action that does not meet constitutional standards." *Hodes & Nauser, MDs, P.A. v.*

*Schmidt,* 309 Kan. 610,624,440 P.3d 461,471 (2019).

**ANSWER:    The allegations in Paragraph 100 of Plaintiffs' Petition are legal**

conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 100 of Plaintiffs' Petition.

101.    Section 2 of the Bill of Rights of the Kansas Constitution states that "[a]ll political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit."

**ANSWER:    Defendant admits the allegations set forth in Paragraph 101 of Plaintiffs' Petition.**

102.    Equal protection requires "similarly situated individuals should be treated alike." *League of Women Voters of Kan. v. Schwab,* 318 Kan. 777,805,549 P.3d 363,383 (2024) *("LWV")* (quoting *State v. Gaudina,* 284 Kan. 354,372, 160 P.3d 854, 866 (2007)).

**ANSWER:    The allegations in Paragraph 102 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 102 of Plaintiffs' Petition.**

103.    As the Kansas Supreme Court recently affirmed, Kansas's election laws- including laws that determine which advance ballots count or do not count-must comply with equal protection. *See LWV,* 318 Kan. at 805--07. Such laws "must be capable of being applied with reasonable uniformity upon objective standards so that no voter is subject to arbitrary and disparate treatment." *Id.* at 805.

**ANSWER:    The allegations in Paragraph 103 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required,**

**Defendant denies every statement, allegation, and averment set forth in Paragraph 103 of Plaintiffs' Petition.**

104.    The Kansas Supreme Court also looks to federal law as a baseline when interpreting the Kansas Constitution's equal protection provisions. *See, e.g., Gaudina,* 284 Kan. at 372.

**ANSWER:    The allegations in Paragraph 99 of Plaintiffs' Petition are legal conclusions to which no response is required.    To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 104 of Plaintiffs' Petition.**

105.    Federal principles of equal protection ensure "the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore,* 531 U.S. 98, 104 (2000). Among other things, this requires "specific rules designed to ensure uniform treatment" to prevent "arbitrary and disparate treatment to voters" based on which county or local jurisdiction they live in. *Id.* at 106-07; *see also LWV,* 318 Kan. at 806 (noting "equal protection requires 'uniform treatment of persons standing in the same relation to the governmental action questioned or challenged'") (quoting *Reynolds v. Sims,* 377 U.S. 533, *565* (1964)).

**ANSWER:    The allegations in Paragraph 105 of Plaintiffs' Petition are legal conclusions to which no response is required.    To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 100 of Plaintiffs' Petition.**

106.    SB 4's rejection rule violates equal protection because it will disenfranchise Kansans who submitted their advance ballots before election day based on arbitrary factors out of their control, including their geographic location. It does not treat similarly situated individuals

alike, and it is not designed to reliably and uniformly count votes. It instead imposes an arbitrary and disparate burden on voters by counting or not counting advance ballots that voters cast by election day based on when the ballot was received by election officials. Voters who will be disproportionately disenfranchised include voters living in rural areas and voters who are temporarily away from Kansas-all of whom are less likely to have their advance ballots delivered on time and counted under the new rejection rule.

**ANSWER:   The allegations in Paragraph 106 of Plaintiffs' Petition are legal conclusions to which no response is required.   To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 101 of Plaintiffs' Petition.**

107.   SB 4' s rejection rule cannot survive strict scrutiny or any other degree of scrutiny.

**ANSWER:   The allegations in Paragraph 107 of Plaintiffs' Petition are legal conclusions to which no response is required.   To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 107 of Plaintiffs' Petition.**

## SECOND CLAIM FOR RELIEF

*Denial of Procedural Due Process*
(Kan. Const. Bill of Rts. § 18)

108.   Plaintiffs hereby re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

**ANSWER:   Defendant denies every statement, allegation, and averment set forth in Paragraph 108 of Plaintiffs' Petition.   Defendant further incorporates by reference all its above-stated denials.**

109.    Section 18 of the Kansas Bill of Rights provides: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." The Kansas Supreme Court has recognized that Section 18 provides for procedural due process. *See In re Marriage of Soden,* 251 Kan. 225,233, 834 P.2d 358,364 (1992); *State v. Wilkinson,* 269 Kan. 603,608, 9 P.3d 1, *5* (2000).

**ANSWER:    Defendant admits the allegations contained in the first sentence of Paragraph 109 of Plaintiffs' Petition. The remaining statements, allegations, and averments set forth in Paragraph 109 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every such statement, allegation, and averment.**

110.    As the Kansas Supreme Court recently affirmed, Kansas's election laws- including laws which determine which advance ballots count or do not count-must comply with procedural due process. *See LWV,* 318 Kan. at 806-07. "Such due process is not provided when the election procedures [for voting by mail]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Raetzel v. Parks/Bellemont Absentee Election Bd.,* 762 F. Supp. 1354, 1358 (D. Ariz. 1990); *see also Saucedo v. Gardner,* 335 F. Supp. 3d 202,217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

**ANSWER:    The allegations in Paragraph 110 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 110 of**

Plaintiffs' Petition.

111.    To determine whether a plaintiff has been denied procedural due process, a court

first asks "whether a protected liberty or property interest is involved and, if it is, the court must

then determine the nature and extent of the process which is due." *Wilkinson,* 269 Kan. at 609.

"The question of the procedural protection that must accompany a deprivation of a particular

property right or liberty interest is resolved by a balancing test, weighing (1) the individual interest

at stake, (2) the risk of erroneous deprivation of the interest through the procedures used and the

probable value, if any, of additional or substitute procedural safeguards, and (3) the State's interest

in the procedures used, including the fiscal and administrative burdens that the additional or

substitute procedures would entail." *Id.* (citing *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976)).

**ANSWER:    The allegations in Paragraph 111 of Plaintiffs' Petition are legal**

**conclusions to which no response is required.  To the extent any response may be required,**

**Defendant denies every statement, allegation, and averment set forth in Paragraph 111 of**

**Plaintiffs' Petition.**

112.    Overall, "due process is flexible and calls for such procedural protections as the

particular situation demands." *Mathews,* 424 U.S. at 334 (quotation and citation omitted).

**ANSWER:    The allegations in Paragraph 112 of Plaintiffs' Petition are legal**

**conclusions to which no response is required.  To the extent any response may be required,**

**Defendant denies every statement, allegation, and averment set forth in Paragraph 112 of**

**Plaintiffs' Petition.**

113.    The Kansas Supreme Court has already recognized that Kansas voters have a liberty

interest in their right to have their advance ballot counted. *See LWV,* 318 Kan. at 828 (Rosen, J.,

concurring in part and dissenting in part) (noting, "[t]he majority appears to agree the legislation

denies a liberty interest"). This makes sense: The nature of the interest at stake in this case-the right to vote and to have that vote counted-is the most precious liberty interest of all because it is preservative of all other basic civil and political rights. *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined.").

**ANSWER:    The allegations in Paragraph 113 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 113 of Plaintiffs' Petition.**

114.    SB 4's rejection rule, however, is neither a reliable nor a fair way to administer voting by mail. The rule results in the rejection of ballots that voters have sent before election day, including even weeks before election day, disenfranchising voters through no fault of their own.

**ANSWER:    The allegations in Paragraph 114 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 114 of Plaintiffs' Petition.**

115.    The value of additional or substitute procedural safeguards to ensure that the valid votes are actually counted is readily apparent. A substitute procedure-requiring Kansas election officials to count all advance mail ballots postmarked on or before election and received by the county within seven days of election day-solves the inequities inherent in SB 4's rejection rule.

**ANSWER:    The allegations in Paragraph 115 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 115 of Plaintiffs' Petition.**

116.    A postmark-based rule both offers a much more reliable date to Kansas voters by which they must cast their ballots and ensures that voters whose ballots are delayed through no fault of their own are still able to engage in the franchise.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 116 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

117.    Because Kansas counties are not required to canvass their votes until thirteen days after the election, *see* K.S.A. 25-3104, requiring Kansas to accept ballots that are postmarked on or before election day and which arrive within seven days of election day would put no significant administrative burden on the state, nor disrupt the election certification process. Indeed, given its historic grace period, Kansas has already shown that it is readily capable of receiving, counting, and accepting ballots that arrive after election day.

**ANSWER:    Defendant is without knowledge or information sufficient to form a belief as to the truth of the statements, allegations, and averments set forth in Paragraph 117 of Plaintiffs' Petition and Defendant therefore denies all such statements, allegations, and averments.**

118.    Having authorized and induced its voters to vote by mail, Kansas must establish adequate procedures to ensure that such voters have a reliable, fair, and effective method to cast their ballots. Because SB 4's rejection rule is markedly inadequate in all those respects, and Kansas is readily capable of instituting a substitute procedure which would protect those voters' rights with minimal burden to the state, SB 4 violates Kansas voters' procedural due process rights.

**ANSWER:    The allegations in Paragraph 118 of Plaintiffs' Petition are legal**

conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 118 of Plaintiffs' Petition.

### THIRD CLAIM FOR RELIEF

*Violations of the Right to Vote*
(Kan. Const. art. 5, § 1; Bill of Rts. §§ 1, 2)

119.    Plaintiffs hereby re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs below as though fully set forth herein.

**ANSWER:    Defendant denies every statement, allegation, and averment set forth in Paragraph 119 of Plaintiffs' Petition.  Defendant further incorporates by reference all its above-stated denials.**

120.    Article 5, Section 1 of the Kansas Constitution guarantees all Kansans a right to vote in the state's elections. "As an expressly enumerated right, article 5 provides the strongest possible constitutional protections." *LWV,* 318 Kan. at 800.

**ANSWER:    The allegations in Paragraph 120 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 120 of Plaintiffs' Petition.**

121.    The right to vote "is a fundamental matter" under the Kansas Constitution, "is pervasive of other basic civil and political rights," and "is the bed-rock of our free political system." *Moore v.* Shanahan*, 207 Kan. 645, 649, 486 P.2d 506, 511 (1971); see also Farley v. Engelken,* 241 Kan. 663, 669-70, 740 P.2d 1058, 1063 (1987) ("Fundamental rights recognized by the Supreme Court include voting"). "[G]overnment infringement of a fundamental right is

inherently suspect" and as such is subject to "strict scrutiny" review. *Hodes & Nauser, MDs, P.A.,* 309 Kan. at 673.

**ANSWER:    The allegations in Paragraph 121 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 121 of Plaintiffs' Petition.**

122.    Under this standard, "once a plaintiff proves an infringement-regardless of degree-the government's action is presumed unconstitutional. Then, the burden shifts to the government to establish the requisite compelling interest and narrow tailoring of the law to serve it." *Id.* at 669 (citing *Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015)).

**ANSWER:    The allegations in Paragraph 122 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 122 of Plaintiffs' Petition.**

123.    SB 4's rejection rule cannot survive strict scrutiny because it does not advance a legitimate state interest, let alone a compelling interest.

**ANSWER:    The allegations in Paragraph 123 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 123 of Plaintiffs' Petition.**

124.    In the alternative, SB 4' s rejection rule violates Article 5, Section 1 of the Kansas Constitution because it is an improper extra-constitutional qualification on the right of suffrage.

"[T]o prevail on a claim that the article 5 right to suffrage has been violated, a plaintiff must show that the Legislature has imposed what amounts to a new, extra-constitutional qualification on the right to be an elector-that is, the law must be shown to unreasonably burden the right to suffrage. Such unreasonable burdens, as a matter of law, bear no reasonable relationship to the Legislature's lawful role of providing proper proofs but instead amount to extra-constitutional and de facto qualifications on the right to suffrage. If a law is shown to violate the *Butts* test-i.e., if it imposes any additional de facto qualifications not expressly set forth in article 5 on the right to become an elector-the law is unconstitutional." *LWV,* 318 Kan. at 801--02. "Once an extra-constitutional qualification on the right to suffrage is found, courts need not permit the government an opportunity to satisfy a balancing test, even such a stringent one as strict scrutiny." *Id.* at 802.

**ANSWER**:   **The allegations in Paragraph 124 of Plaintiffs' Petition are legal conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 124 of Plaintiffs' Petition.**

125.   SB 4's rejection rule "bears no reasonable relationship to the Legislature's role in providing proper proofs" because it does not pertain to the regulation of a voter's qualifications to vote as those qualifications are outlined in the Kansas Constitution. *See* Kan. Const. Bill of Rts. § 1 (explaining that qualifications to vote include identity, citizenship, age, and residency). Because SB 4 "imposes" an "additional de facto qualification[] not expressly set forth in section 1 (identity, citizenship, age, and residency)," it is "unconstitutional." *LWV,* 318 Kan. at 855 (Standridge, J. concurring in part and dissenting in part).

**ANSWER**:   **The allegations in Paragraph 125 of Plaintiffs' Petition are legal**

conclusions to which no response is required.  To the extent any response may be required, Defendant denies every statement, allegation, and averment set forth in Paragraph 125 of Plaintiffs' Petition.

## PRAYER FOR RELIEF

WHEREFORE, this Court should:

A.  Declare that SB 4 and its amendments to K.S.A. 25-1132 are unconstitutional because it infringes on Plaintiffs' rights to equal protection, due process, and suffrage under the Kansas Constitution; and

B.  Enjoin Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from discounting any otherwise valid advance ballots postmarked by but received within seven days of election day; and

C.  Award Plaintiffs their costs, expenses, and reasonable attorneys' fees; and

D.  Grant such other and further relief as the Court deems just, proper and equitable.

**ANSWER:**    **Defendant Shew states that he will follow the law of the State of Kansas as provided in the Kansas Statutes, Kansas Administrative Regulations, and as interpreted and ordered by the Courts of the State of Kansas.  Defendant denies that Plaintiffs are entitled to recover their costs, expenses, or reasonable attorneys' fees from this Defendant. .**

## DEFENDANT'S ADDITIONAL STATEMENTS AND AFFIRMATIVE DEFENSES

1.      Defendant denies each and every statement, allegation, and averment contained in Plaintiffs' Petition that has not been specifically admitted herein, including but not limited to those in the "WHEREFORE" paragraphs.

2.      Without waiving any other defense or denial, Defendant states that it is not required to respond to statements, allegations, and/or averments set forth in Plaintiffs' Petition which are issues, statements, conclusions, or questions of law.

3.      Without waiving any other defense or denial, Defendant states that Plaintiffs cannot recover on their claims, in whole or in part, to the extent the Court finds Plaintiffs' Petition fails to state a claim upon which relief may be granted against Defendant.

4.      Without waiving any other defense or denial, Defendant states that Plaintiffs cannot recover on their claims, in whole or in part, to the extent the Court finds that the claims alleged in Plaintiffs' Petition are barred by the doctrines of ripeness or mootness.

5.      Without waiving any other defense or denial, Defendant states that Plaintiffs cannot recover on their claims, in whole or in part, to the extent the Court finds that the claims alleged in Plaintiffs' Petition are barred by Plaintiffs' lack of standing.

6.      Without waiving any other defense or denial, Defendant states that Plaintiffs cannot recover on their claims, in whole or in part, to the extent the Court finds that the claims alleged in in Plaintiffs' Petition are barred by the doctrine of waiver.

7.      Without waiving any other defense or denial, Defendant states that Plaintiffs cannot recover on their claims, in whole or in part, to the extent the Court finds that the claims alleged in in Plaintiffs' Petition are barred by the doctrine of estoppel.

8.      Without waiving any other defense or denial, Defendant states that Plaintiffs cannot recover on their claims, in whole or in part, to the extent the Court finds that the Court lacks subject matter or personal jurisdiction over some or all of the claims alleged in the Plaintiffs' Petition.

9.      Without waiving any other defense or denial, Defendant states that Plaintiffs cannot recover on their claims, in whole or in part, to the extent the Court finds that some or all of the claims alleged in Plaintiffs' Petition are be barred by sovereign immunity.

10.     Without waiving any other defense or denial, Defendant states that Plaintiffs have failed to plead facts establishing that they are entitled to recover their costs, expenses, or attorneys' fees.

11.     Without waiving any other defense or denial, Defendant states that Plaintiffs have failed to exhaust administrative remedies.

12.     Without waiving any other defense or denial, Defendant states that Plaintiffs have failed to join necessary and indispensable parties.

13.     Defendant reserves the right to assert any additional affirmative defenses that may be revealed during discovery.

WHEREFORE, having fully answered, Defendant Jamie Shew, in his official capacity as Douglas County Clerk, respectfully requests that this Court dismiss Plaintiffs' Petition in its entirety; award Defendant his reasonable attorneys' fees, court costs, and related expenses; and grant Defendant such other and further relief as this Court deems just and proper.

Respectfully submitted,

**SEYFERTH BLUMENTHAL & HARRIS LLC**

*/s/  John T. Bullock*
John T. Bullock, **KS Bar #15119**
Kevin J. Karpin, **KS Bar #16947**
4801 Main Street, Suite 310
Kansas City, Missouri 64112
(816) 756-0700 (Telephone)
(816) 756-3700 (Facsimile)
johnb@sbhlaw.com
kevin@sbhlaw.com

1031 Vermont Street, Suite 130
Lawrence, Kansas 66044
(by appointment only)

**ATTORNEYS FOR DEFENDANT
JAMIE SHEW IN HIS OFFICIAL CAPACITY
AS DOUGLAS COUNTY CLERK**

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF for the District of Kansas which sent notification of such filing to all attorneys of record.

Pedro L. Irigonegaray (#08079)
Nicole Revenaugh (#25482)
**IRIGONEGARA Y & REVEN A UGH**
1535 S.W. 29th Street
Topeka, KS 66611
(785) 267-6115
pedro@itrlaw.com
nicole@itrlaw.com

and

Elisabeth C. Frost*
Christina Ford*
Branden D. Lewiston*
Marisa A. O'Gara*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
(202) 968-4490
efrost@elias.law
cford@elias.law
blewiston@elias.law
mogara@elias.law

***Counsel for Plaintiffs***

**Appearing Pro Hae Vice*

Teresa A. Woody (#16949)
**KANSAS APPLESEED CENTER FOR LAW AND JUSTICE, INC.**
211 E. 8th St., Suite D
Lawrence, KS 66044
(785) 251-8160
twoody@kansasappleseed.org

***Counsel for Kansas Appleseed Center For Law and Justice, Inc.***

Bradley J. Schlozman (KS Bar #17621)
**HINKLE LAW FIRM LLC**
1617 North Waterfront Parkway, Suite 400
Wichita, Kansas 67206
Tel.: (316) 267-2000
Fax: (316) 630-8466
E-mail: bschlozman@hinklaw.com

***Counsel for Defendant Scott Schwab, in his official capacity as the Kansas Secretary of State***

/s/  John T. Bullock
**Attorney for Defendant Jamie Shew, in his official capacity as Douglas County Clerk**